UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT JORDAN,

      Plaintiff,                                Case No. 13-cv-13747
                                                  Hon. Matthew F. Leitman

v.

GREYHOUND LINES, INC.,

      Defendant.

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF #12)

## INTRODUCTION

In September 2012, Plaintiff Robert Jordan ("Jordan"), a Deployment Manager for Defendant Greyhound Lines, Inc. ("Greyhound"), was instructed by his supervisor to temporarily operate a bus station in Chicago, Illinois. Jordan did not comply with his supervisor's instructions; instead, he shut down the station that he was directed to keep open. As a result, Greyhound terminated Jordan's employment. Thereafter, Jordan filed the instant action against Greyhound, alleging racial discrimination, age discrimination, and breach of an implied contract. Greyhound now moves for summary judgment. For the reasons explained below, the Court **GRANTS** Greyhound's Motion.

## FACTUAL BACKGROUND

### A. Jordan Begins Working For Greyhound and Is Promoted to Area Manager

Jordan, an African-American man born in 1961, began working for Greyhound in 1991 as a Customer Service Manager in the company's Detroit bus station. (*See* Jordan Deposition, ECF #12-27 at 8, 35, 42, 209; Pg. ID 208, 215, 217, 258.) About a year later, Greyhound promoted Jordan to Terminal Manager at its station in Grand Rapids, Michigan. (*See id.* at 44, Pg. ID 217.)

In 2000, Greyhound again promoted Jordan, this time to Area Manager in Detroit. (*See id.* at 49, 51; Pg. ID 218-19.) As Area Manager, Jordan served as a liaison between Greyhound and the independently-contracted agents who operate Greyhound bus stations.[1] (*See id.* at 49-51, Pg. ID 218-19.) At some point during Jordan's tenure as an Area Manager, Jordan began reporting to Tim Lukes ("Lukes"). (*See id.* at 52, Pg. ID 219; Lukes Decl. at ¶¶1, 3.) Lukes served as Greyhound's Director of Operations Support. (*Id.*)

---

[1]  Greyhound maintains two types of bus stations.  The most common type of Greyhound station is operated by an independently-contracted agent (an "agent-run station").  In some cases, however, Greyhound runs a station directly using its own employees (a "company-run station").  (*See id.* at 29, Pg. ID 213.)  Jordan's job as Area Manager, and later as Deployment Manager, dealt with Greyhound's agent-run stations.  (*See id.* at 49-50; Pg. ID 218-19; Lukes Declaration, ECF #12-26 at ¶5.)

**B. Greyhound Restructures its Area Manager Position**

Greyhound reorganized in early 2011, splitting the job responsibilities previously assigned to Area Managers among three different positions: (1) Deployment Managers, (2) Sales Managers, and (3) Critical Compliance Managers. (*See* Lukes Decl. at ¶4; Jordan Dep. at 55, 57; Pg. ID 220.) Deployment Managers were assigned to, among other things, oversee the day-to-day operations of existing agent-run stations and train new agents. (*See* Jordan Dep. at 57, 59; Pg. ID 220-21; Organization Chart, ECF #12-3 at 1, Pg. ID 110.)[2] Sales Managers were in charge of finding new locations for Greyhound stations and agents to operate those stations. (*See* Jordan Dep. at 59, Pg. ID 221; Organization Chart at 1, Pg. ID 110.) Critical Compliance Managers were responsible for auditing agent-run stations and for "closing" an agent-run station when an agent terminated his or her relationship with Greyhound. (*See* Jordan Dep. at 57-58, Pg. ID 220-21; Organization Chart at 1, Pg. ID 110.) According to Jordan, the type of "closing" conducted by a Critical Compliance Manager involved winding up a departing agent's business relationship with Greyhound, not physically closing or shutting a down station when an agent terminated his relationship with Greyhound. (*See* Jordan Dep. at 130, Pg. ID 239.)

---

[2]   Deployment Managers' other responsibilities included the initial opening and deployment of an agent-run station and interactions with government authorities. (*See* Organization Chart at 1, Pg. ID 110.)

3

Following the 2011 reorganization, Greyhound staffed every geographic region throughout the United States with a team of one Deployment Manager, one Critical Compliance Manager, and one Sales Manager.  (*See* Lukes Decl. at ¶¶4, 8.)  Jordan became the Deployment Manager for the team that covered Michigan, Ohio, Indiana, Illinois, Wisconsin, Iowa, and Minnesota (the "Midwest Region"). (*See* Jordan Dep. at 57, 59; Pg. ID 220-21; Map of Deployment Managers, ECF #12-5.)  As a Deployment Manager, Jordan spent approximately 80 percent of his time "on the road," away from his office in Detroit.  (*See id.* at 61, Pg. ID 221.)

Critical Compliance Manager Eric Thiry and Sales Manager Robert Hawkins worked with Jordan to cover the Midwest Region.  (*See* Lukes Decl. at ¶8.)  Thiry, a white male born in 1971, reported to Sean Sweeney ("Sweeney"), the supervisor of the Crticial Compliance team.  (*See* Sherrie Pittman Decl., ECF #12-25 at ¶7; Lukes Decl. at ¶6.)  Hawkins, a white male born in 1962, reported to Lukes (as did Jordan).  (*See* Pittman Decl. at ¶6; Lukes Decl. at ¶7.)

## C. Lukes Instructs Jordan to Temporarily Operate an Agent-Run Station in Chicago; Jordan Does Not Comply; and Greyhound Fires Jordan

### 1. Jordan Receives Notice That an Agent in Chicago Is Terminating Her Contract with Greyhound

Greyhound operated an agent-run station located at 95th Street in Chicago (the "95th Station").  Although some Greyhound employees thought that the 95th Station was located in a dangerous area (*see, e.g.*, Jordan Dep. at 172-73, Pg. ID

4

249), the station generated more than $1 million per year in revenue (*see id.* at 109, Pg. ID 233).

On August 24, 2012, Beverly Parker ("Parker"), the agent who operated the 95th Station, gave Jordan notice that she would terminate her contract with Greyhound in 30 days. (*See* Sept. 5th Emails, ECF #12-11 at 2, Pg. ID 142.) Later that day, Jordan emailed Lukes, Sweeney, and Chicago District Manager Brian Rogers ("Rogers") to inform them that Parker had given notice of her intent to terminate her contract. (*See id.*) Jordan stated that Parker's last day would be September 27th and that he planned to shut down the station for one day (September 28th) "to wrap up all the paperwork." (*Id.*) Jordan recommended that Greyhound convert the 95th Station to a company-run station, using employees from Greyhound's downtown Chicago station to operate the station. (*Id.*)

On September 5th, Rogers responded that he would prefer to find a new agent to operate the 95th Station rather than convert it to a company-run station. (*See id.* at 1-2, Pg. ID 141-42.)   Rogers also solicited input from a senior Greyhound official, Vice President of Customer Experience Myron Watkins ("Watkins"). (*Id.*) Later that same day, Watkins responded: "Agreed.  Agent run." (*Id.* at 1, Pg. ID 141.)

Watkins also directed Jordan not to shut down the 95th Station on September 28th because Watkins expected it to be a "high sales day[]." (*Id.; see also* Jordan

5

Dep. at 117, Pg. ID 235.)  Jordan happened to be on vacation on September 5th, when Watkins issued the instruction to keep the 95th Station open as an agent-run station, but Jordan acknowledges that he received the e-mail.  (*See* Jordan Dep. at 114, 119, Pg. ID 235-36.)

## 2. Lukes Instructs Jordan to Keep the 95th Station Open Until Jordan Finds a Replacement for Parker

Lukes sent Jordan the following email shortly after Watkins issued his directive to keep to station open and operating as an agent-run station:

> Robert – as soon as you return from vacation you need to hop on getting a replacement for the 95th [Station] agent.  This needs to be your #1 priority.  It must remain open even if you need to go there to run it and live in Chicago until you can find a replacement.  Please let me know if you need any help.

(*See* Lukes Email, ECF #12-12.)

Jordan returned from vacation on September 10th.  (*See* Jordan Dep. at 120, Pg. ID 236.)  On September 13th, Jordan emailed Thiry, the Critical Compliance Manager assigned to the Midwest Region, to ask whether he "plan[ed] to be [in Chicago] on Friday, September 28" in order to close out Parker (i.e., to wind up Parker's business relationship with Greyhound).  (*See* Sept. 13th Emails, ECF #12-13 at 1, Pg. ID 144.)  Thiry responded, "I've never planned on being there on the 28th.  I will be in Edmonton that week…."  (*Id.*)  Jordan forwarded Thiry's response to Lukes and to Sweeney, Thiry's supervisor.  (*Id.* at 3, Pg. ID 146.)

Later on September 13th, Lukes asked Sweeney to identify the member of Sweeney's team who would be "closing out" Parker. (*Id.* at 3, Pg. ID 146.) Sweeney responded: "I can't get anyone there. Have two choices: when the new agent starts have [Jordan] close out the location or possibly move [the transition date] to [September 30th or October 1st] and have [Thiry] down there." (*Id.*)

After receiving Sweeney's email, Lukes asked Jordan: "I know you've only been back for a couple of days but have you had a chance to determine how[] you'll keep this place open?" (*Id.*) Jordan acknowledges that he understood from this email that it was his responsibility to keep the 95th Station open until he found an agent to replace Parker. (*See* Jordan Dep. at 139, Pg. ID 241.)

### 3. Jordan Attempts to Find Replacement Agent for 95th Station

Jordan took initial steps toward finding a new agent to replace Parker at the 95th Station. He prepared a financial statement for the 95th Station and asked agents who operated other Greyhound stations whether they would agree to run the 95th Station. (*See id*. at 122-25, Pg. ID 237.) Jordan claims that he even submitted applications from three existing Greyhound agents to operate the 95th Station. (*See id.* at 148, Pg. ID 243; Background Check Forms, ECF #12-14.) But Jordan did not receive approval from Greyhound to hire a replacement agent prior to Parker's last day. (*See* Jordan Dep. at 155-56, Pg. ID 245.)

7

### 4. Jordan Shuts Down the 95th Station

In direct contravention of the directives from Watkins and Lukes, Jordan shut down the 95th Station when Parker terminated her contract on September 27th. (*See id.* at 157, Pg. ID 245.) Jordan converted the station into an unmanned "bus stop," which, unlike a station, does not sell tickets and does not have staff on site to assist customers. (*See id.* at 117-18, 174; Pg. ID 235-36, 250.) According to Jordan, he shut down the station because he couldn't "keep [the] station open 17 hours a day, seven days a week by [him]self." (*Id.* at 159, Pg. ID 246.) However, Jordan admits that he did not make any effort to keep the 95th Station open for even several hours per day – instead, he shut the station entirely and returned home to Detroit. (*See id.*) Jordan did not tell Lukes or anyone else at Greyhound that he was shutting down the 95th Station. (*See id.* at 157, Pg. ID 245.)

### 5. Greyhound Terminates Jordan for Insubordination

Lukes learned that Jordan shut down the 95th Station on September 28th. (*See id.* at 159, Pg. ID 246.) After speaking with Jordan – who admitted to being at home in Detroit, rather than in Chicago trying to keep the 95th Station open – Lukes discussed Jordan's conduct with senior Greyhound officials, including Watkins. (*See* Lukes Decl. at ¶17, Pg. ID 204-05.) Thereafter, Lukes "made the decision to terminate Jordan's employment based on Jordan's failure to follow [Lukes'] directives to find a replacement agent for the [95[th] Station] and to go to

Chicago and operate the station himself until he found a replacement." (*Id.*) On October 3, 2012, Lukes informed Jordan that Greyhound had terminated Jordan's employment. (*See* Jordan Dep. at 176-77, Pg. ID 250.)

## PROCEDURAL HISTORY AND NATURE OF JORDAN'S CLAIMS

Jordan filed the instant action in Wayne County Circuit Court on August 9, 2013. (*See* Complaint, ECF #1-1.) Jordan's Complaint contains three counts.

In Count I, Jordan asserts that Greyhound discriminated against him based upon his age in violation of Michigan's Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2101 *et seq*. (*See* Compl. at ¶¶28-35.) Jordan alleges that his "age was a significant and principal factor that made a difference in [Greyhound's] decision to terminate [him]." (*Id.* at ¶30.)

In Count II, Jordan asserts a racial discrimination claim under the ELCRA. (*See id.* at ¶¶36-43.) Jordan's race discrimination claim has two components. In the first component, Jordan alleges that Greyhound discriminated against him by "requir[ing him] to fulfill job functions as a result of his membership within a specific race." (*Id.* at ¶39.) Specifically, Jordan complains that he was instructed to (1) find a replacement for Parker, (2) "close out" Parker's business relationship with Greyhound, and (3) keep the 95th Station open, while Thiry and Hawkins, two white employees, were not required to do so, even though, Jordan argues, their job responsibilities included those tasks. (*See* Jordan Brief, ECF #14 at 6-8, Pg. ID

9

290-91.)   In the second component of Jordan's race discrimination claim, he alleges that his race "was a contributing factor in [Greyhound's] decision to terminate [him]."  (*Id.* at ¶¶39, 42.)

In Count III, Jordan claims that Greyhound breached an implied contract with him when it terminated his employment.  (*See id.* at ¶¶44-51.)

Greyhound removed the action to this Court on September 3, 2013.  (*See* Notice of Removal, ECF #1.)  Greyhound now moves for summary judgment. (*See* Motion, ECF #12.)  The Court heard oral argument on Greyhound's Motion on August 15, 2014.  For the reasons discussed below, the Court now **GRANTS** Greyhound's Motion.

## GOVERNING LEGAL STANDARD

A movant is entitled to summary judgment when it "shows that there is no genuine dispute as to any material fact...." *U.S. SEC v. Sierra Brokerage Services, Inc.,* 712 F.3d 321, 326–27 (6th Cir. 2013) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52 (1986)) (quotations omitted). When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.*  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson,* 477 U.S. at 252.  Summary judgment is not appropriate

10

when "the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-252.  Indeed, "[c]redibility determinations, the weighing of the evidence, and the drafting of legitimate inferences from the facts are jury functions, not those of a judge…" *Id.* at 255.

## ANALYSIS

### A. Legal Standard Governing Jordan's Discrimination Claims

The ELCRA provides that an employer shall not "discharge … or otherwise discriminate against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of … race… [or] age…." M.C.L. § 37.2202(1)(a).  A plaintiff who, like Jordan, lacks direct evidence of discrimination may rely on indirect or circumstantial evidence to establish a discrimination claim under the ELCRA.  *See, e.g.*, *Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-21 (Mich. 2001).[3]  Under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), to establish a prima facie case of discrimination under the ELCRA, a plaintiff must show that (1) he is a member of a protected class, (2) he suffered an adverse employment action,

---

[3]  Direct evidence is "evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor" in an adverse employment action.  *Id.* at 520 (quoting *Jacklyn v. Shering-Plough Healthcare Products Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).  Jordan has not cited direct evidence of discrimination in support of either his racial or age discrimination claims.  (*See* Jordan Dep. at 205-06, 208-09; Pg. ID 257-58.)

11

(3) he was qualified for the position, and (4) he was treated differently than other similarly-situated employees outside of his protected class for the same or similar conduct. *See, e.g., Town v. Michigan Bell Telephone Co.*, 568 N.W.2d 64, 68 (Mich. 1997); *Reisman v. Wayne State Univ. Regents*, 470 N.W.2d 678, 685 (Mich. App. 1991).

If a plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hazle*, 628 N.W.2d at 521-22. If the defendant carries this burden, then the burden shifts back to the plaintiff to show that the legitimate reasons offered by the employer were "pretext for unlawful discrimination" *Id.*

## B. Jordan's Age Discrimination Claim

Jordan's age discrimination claim fails because he has not established the fourth element of his prima facie case – that he was treated differently than another similarly-situated Greyhound employee outside of his protected age class for the same or similar conduct. Jordan has identified only two Greyhound employees – Thiry and Hawkins – whom he alleges were similarly-situated to him and whose disparate treatment allegedly evidences Greyhound's age discrimination. (*See* Jordan Dep. at 184-85, Pg. ID 252.) But both Thiry and Hawkins are within – not outside of – Jordan's protected age class.

For purposes of the ELCRA, employees over the age of 40 are considered members of a protected class. *See Lytle v. Malady*, 579 N.W.2d 906, 914-15 (Mich. 1998). Jordan (50 years old), Thiry (41 years old), and Hawkins (49 years old) were each members of the protected class at the time that the events in question transpired. (*See* Jordan Dep. at 8, Pg. ID 208; Pittman Decl. at ¶¶6-7.) Accordingly, even if Jordan had shown that Greyhound treated him differently than Thiry and Hawkins (and, as discussed below with respect to his racial discrimination claim, he has not), he still would not be able to establish the fourth element of his prima facie case because Thiry and Hawkins are *within* his protected class.

Moreover, Jordan has not cited any evidence that his age had anything to do with Greyhound's decision to terminate his employment. In fact, Jordan concedes that his age discrimination claim is based "on a subjective feeling that [he] had" and he does not have "other facts or evidence to support [his] age discrimination claim." (Jordan Dep. at 204-05, Pg. ID 257.) Jordan's "subjective feeling" falls far short of the evidentiary showing needed to defeat Greyhound's well-supported motion for summary judgment on Jordan's age discrimination claim.

13

**C. Jordan's Racial Discrimination Claim**

    **1. Jordan Has Not Established a Prima Facie Case of Racial Discrimination**

        **a. Jordan Has Not Established a Prima Facie Case of Racial Discrimination Based On Greyhound's Assignment of Responsibilities for the 95th Station**

The first component of Jordan's racial discrimination claim is that he was forced to "to fulfill job functions as a result of his membership within a specific race." (Compl. at ¶39.)  The job functions to which Jordan refers are the tasks resulting from the termination of Parker's contract:  (1) finding a replacement for Parker, (2) "closing out" Parker's business relationship with Greyhound, and (3) keeping the 95th Station open until Greyhound contracted with a replacement agent.  (*See* Jordan Br. at 6-8, Pg. ID 290-92.)  Jordan argues that Thiry and Hawkins should have participated in the completion of these tasks – with Hawkins working on the first task  (i.e., replacing Parker), and Thiry working on the second and third tasks  (i.e., closing out Parker and keeping the 95th Station open).  (*See id.*; Compl. at ¶¶18-21.)  However, Jordan contends that Greyhound singled him out, as an African-American, to handle all of these responsibilities – and excused the similarly-situated Thiry and Hawkins from the assignments – because the 95th Station was in a predominantly African-American neighborhood.  (*See* Jordan Br. at 5, Pg. ID 289.)  Jordan has failed to establish a prima facie case of discrimination on this theory because he has not demonstrated that he was

similarly situated to, and that Greyhound treated him less favorably than, Thiry or Hawkins.

### i. Jordan Has Not Demonstrated That (1) Greyhound Treated Him Less Favorably Than Thiry, or (2) He Was Similarly Situated to Thiry

Jordan alleges that Greyhound treated him less favorably than it treated Thiry when it permitted Thiry to "avoid[]" his responsibilities relating to the 95th Station. (Compl. at ¶19.) But Jordan has presented no evidence that Greyhound actually excused Thiry from handling responsibilities for the 95th Station. In fact, the evidence indicates the contrary: that Sweeney (Thiry's supervisor) offered to send Thiry to Chicago to work at the 95th Station on September 30th or October 1st, as soon as Thiry returned from Edmonton. (*See* Sept. 13th Emails at 3, Pg. ID 146.) Thus, it appears that Greyhound actually treated Thiry and Jordan *the same* when it assigned responsibility for the 95th Station: Sweeney was willing to send Thiry to Chicago as soon as Thiry was available, just as Lukes was willing to send Jordan to Chicago when Jordan was available.

Sweeney's offer to send Thiry to the 95th Station as soon as Thiry returned from Edmonton severely undermines Jordan's contention that Greyhound's decision to assign Jordan to keep the 95th Station open was based on Greyhound's reluctance to send a white employee to that station. Indeed, Sweeney's offer to send Thiry to the 95th Station suggests that Jordan's assignment was not a matter

race, but largely one of timing – Thiry simply was not available to be in Chicago on September 28th (the day Parker's contract with Greyhound ended), while Jordan was available at that time.

Moreover, Jordan has not demonstrated that Greyhound treated Thiry more favorably by allowing Thiry to remain in Edmonton (rather than travel to Chicago) on September 28th. In fact, accommodating Thiry's travel schedule is yet another way in which Greyhound treated Jordan and Thiry *the same*: the company did not require either employee to perform tasks related to the 95th Station while traveling. Greyhound accommodated Jordan's vacation in early September in precisely the same way that it handled Thiry's travel to Edmonton. More specifically, on September 5th, Lukes emailed Jordan that the 95th Station "needs to be [Jordan's] #1 priority," *but Lukes indicated in the same email that he did not expect Jordan to work on the 95th Station while Jordan was on vacation.* (*See* Lukes Email.) Thus, Greyhound did not treat Thiry any more favorably than Jordan when it did not require Thiry to cut short his trip in order to travel to Chicago.

Finally, and in any event, Jordan's claim also fails because he has not shown that he and Thiry were similarly situated in their abilities to handle assignments for the 95th Station. Two employees are similarly situated if "all of the relevant aspects of [their] employment situation[s] [are] nearly identical." *Town*, 568 N.W.2d at 70 (internal citations omitted). In this case, Jordan has not shown that

16

he and Thiry were similarly situated in one important aspect – their availability to travel to Chicago on September 28th.  It is undisputed that Thiry was scheduled to be in Edmonton on September 28th.  (*See* Sept. 13th Emails at 1, Pg. ID 144.)  In contrast, Jordan has presented no evidence that he was unable to be in Chicago on September 28th.  Accordingly, Jordan has not demonstrated that he and Thiry were similarly situated in their abilities to handle the 95th Station.

### ii. Jordan Has Not Demonstrated That (1) He Was Similarly Situated to Hawkins, or (2) Greyhound Treated Him Less Favorably Than Hawkins

Jordan argues that Greyhound discriminated against him when it assigned him to find a replacement for Parker while at the same time excusing Hawkins from undertaking this task.  (*See* Jordan Br. at 6, 15, Pg. ID 290, 299; Jordan Dep. at 115, Pg. ID 235.)  But Jordan has asked this Court to credit evidence that conclusively establishes that it was *not* within Hawkins' job description to find a replacement agent.  Specifically, Jordan insists that Greyhound's "organizational chart [ECF 12-3] *clearly shows* what person has what assignment and what team handles which problems." (Jordan Br. at 7, Pg. ID 291) (emphasis added).  The organizational chart states that Hawkins was responsible for "[s]ourc[ing] *new* locations" and says *nothing* about Hawkins having responsibility for replacing an agent who terminates her contract to operate an *existing* Greyhound station.  (*See* Organization Chart) (emphasis added).  In contrast, the same organizational chart

17

indicates that Jordan, as Deployment Manager, was responsible for (among other things) "*[e]xisting* locations," such as the 95th Station.   (*Id*.) (emphasis added.).   Accordingly, the organizational chart – which Jordan contends "clearly shows" his and Hawkins' job assignments – establishes that it was *not* Hawkins' responsibility to find a replacement for Parker and, in fact, that replacing Parker was at least arguably within Jordan's duties.  For this reason, Hawkins is not a fair comparable for the purposes of Jordan's discrimination claims.

Moreover, and in any event, Jordan has failed to establish that Greyhound, in fact, treated him less favorably than Hawkins.  Jordan has assumed (without citing support in the record) that Greyhound did not direct Hawkins to find a replacement for Parker.  Jordan was able to testify that, *as far as he knew*, Hawkins did not attempt to find a replacement agent for the 95th Station. (*See, e.g.*, Jordan Dep. at 138, 184; Pg. ID 241, 252.)  But in response to Greyhound's motion, Jordan has cited no actual evidence of whether Greyhound instructed Hawkins to find a replacement agent nor whether Hawkins was, in fact, working to find a replacement.   Indeed, Jordan does not claim to have knowledge of any communications between Greyhound and Hawkins related to the 95th Station.  In fact, Jordan testified that he asked Lukes during September 2012 what Hawkins was working on, but Lukes did not tell him what Hawkins was doing. (*See* Jordan Dep. at 138, Pg. ID 241.)  This lack of information regarding Hawkins' job

assignments is fatal to Jordan's claim. Jordan simply has not shown that Greyhound excused Hawkins from finding a replacement for Parker nor that Hawkins made no effort to find a replacement.

Jordan had ample opportunities to develop evidence supporting his allegation that Greyhound gave Hawkins a "pass" when it came to finding a replacement for Parker. Jordan could have deposed Hawkins, Lukes, or other Greyhound employees to determine whether Hawkins was told to help find a replacement for Parker. He did not. At oral argument, Jordan admitted that he made an economic decision not to take any depositions in connection with this litigation. But, even so, Jordan could have sought information concerning Hawkins activities through interrogatories and/or requests to admit. He did not. Jordan's economic decisions have left him with a hole in his prima facie case – no evidence that Greyhound, in fact, treated Hawkins more favorably with respect to finding a replacement for Parker – and that hole entitles Greyhound to summary summary judgment on Jordan's race discrimination claim.

### b. Jordan Has Not Established a Prima Facie Case of Racial Discrimination Based On His Termination

The second component of Jordan's racial discrimination claim is that race "was a contributing factor in [Greyhound's] decision to terminate [him]." (Compl. at ¶42.) However, Jordan has failed to demonstrate that, by terminating him, Greyhound treated Jordan differently than Thiry or Hawkins (or any other

Greyhound employee outside of his protected class) *for the same or similar conduct*.  Jordan has acknowledged that he was terminated because he did not follow his supervisor's instructions to keep the 95th Station open – instructions that originated with Watkins, a Vice President of Greyhound.  (*See, e.g.*, Jordan Dep. at 177, Pg. ID 250.)  In addition, Jordan was aware that Watkins felt that keeping the 95th Station open was of significant importance to Greyhound.  (*See* Sept. 5th Emails at 1, Pg. ID 141; Jordan Dep. at 114, Pg. ID 235.)  However, Jordan has presented no evidence that Thiry or Hawkins (or any other Greyhound employee outside of his protected class) (1) disobeyed a high-ranking Greyhound official's express instructions on a matter of significant import to the company, and (2) was not terminated as a result.  Accordingly, Jordan has not established a prima facie case of discrimination with respect to his termination.

Jordan counters by identifying one instance in which Thiry did not comply with a direction from Sweeney to shut down a bus station in Springfield, Illinois (the "Springfield Station").  (*See* Jordan Dep. at 167-170, Pg. ID 248-49.)  But Jordan has not demonstrated that Thiry's alleged noncompliance is comparable to Jordan's.  For instance, Jordan admits that he disobeyed a directive that originated with Watkins, a Vice President of the company.  (*See* Jordan Dep. at 114, 162; Pg. ID 235, 247.)  In contrast, the directive that Thiry allegedly disobeyed was issued by Sweeney, a manager who does not rank nearly as high as Watkins.  Moreover,

20

the directives in question were fundamentally different – Jordan was told to keep open the 95th Station (thereby enabling the station to continue earning revenue and servicing Greyhound customers), whereas Thiry was instructed to shut down the Springfield Station (thereby cutting off its income).  Jordan has not shown that Thiry's alleged failure to *close* the Springfield Station was as consequential to Greyhound as Jordan's failure to *keep open* the 95th Station.

Furthermore, the decision to fire Jordan was made by Lukes (*see* Lukes Decl. at ¶17), while the decision not to fire Thiry was made by Sweeney (*see* Jordan Dep. at 170, Pg. ID 249).  The involvement of different decision-makers makes Thiry a less-relevant comparable for purposes of establishing a prima facie case of discrimination.  *See, e.g.*, *Bobo v. United Parcel Service, Inc.* (665 F.3d 741, 751 (6th Cir. 2012) (employees who report to different supervisors generally are not similarly situated).  Finally, it appears that there were mitigating factors involved in Thiry's situation – specifically, Sweeney acknowledged that he was still "getting [his] team together" when Thiry was tasked with shutting down the Springfield Station."  (*See id.* at 170, Pg. ID 249.)  Jordan has not presented similar evidence that Lukes' team was still in the nascent stages of its reorganization when Lukes decided to fire him.  For all of these reasons, Jordan has failed to show that Greyhound's decision to retain Thiry satisfies the fourth element of Jordan's prima facie case.

**2. Even if Jordan Had Established a Prima Facie Case of Racial Discrimination, Greyhound Had Legitimate, Nondiscriminatory Reasons for Its Decisions, and Jordan Has Not Presented Evidence of Pretext for Unlawful Discrimination**

Even if Jordan had established a prima facie case of racial discrimination (and he has not), his racial discrimination claim would fail because (1) Greyhound has presented legitimate, nondiscriminatory reasons for its decisions, and (2) Jordan has not presented evidence that Greyhound's reasons were a pretext for unlawful discrimination. Greyhound has cited a legitimate, nondiscriminatory reason for terminating Jordan – Jordan shut down the 95th Station despite express instructions to keep the station open. (*See* Lukes Decl. at ¶17.) In order to prove that this reason is pretextual, Jordan must show that it (1) has no basis in fact, (2) was not the actual reason motivating Greyhound's decision, or (3) was not sufficient to justify the decision. *See Feick v. County of Monroe*, 582 N.W.2d 207, 212 (Mich. App. 1998). Jordan has not made such a showing.

Jordan has not presented evidence that Greyhound's reason for terminating him had no basis in fact – to the contrary, he admits that he did not comply with orders relating to the 95th Station. (*See* Jordan Dep. at 162, Pg. ID 247.)[4] Nor has

---

[4] During his deposition, Jordan asserted that Greyhound's orders were contradictory and therefore he could not have complied. Specifically, Jordan stated that he could not keep the 95th Station open because "they … said they didn't want it to be a company[-run] station." (*Id.* at 160, Pg. ID 246.) Jordan claimed that because he was employed by Greyhound, the 95th Station would have

22

Jordan shown that his noncompliance was not the actual reason behind Greyhound's decision – to the contrary, he concedes that he was terminated because of his handling of the 95th Station. (*See* Jordan Dep. at 183, Pg. ID 252.) And Jordan's decision to shut down the 95th Station was clearly sufficient to justify Jordan's termination, as Jordan had disobeyed Lukes' express instructions to make the continued operation of the 95th Station – which generated more than $1 million in annual revenues – his top priority. Under these circumstances, there is no evidence that Greyhound's reasons for terminating Jordan were pretextual.

**D. Jordan's Breach of Implied Contract Claim**

Jordan claims that Greyhound (1) created an implied employment contract with him when it gave him written materials describing his job responsibilities and (2) breached that implied contract when it terminated his employment. (*See* Compl. at ¶¶44-51.) In its Motion, Greyhound argues that Jordan's contract claim fails because Jordan's employment application and Greyhound's employee handbook "explicitly stated that [Jordan's] employment would be terminable at-

---

become "a company[-run] station if [he ran] it." (*Id.*) The Court is not persuaded by this reasoning. Rogers and Watkins indicated in their emails on September 13th that they preferred for the 95th Station to be run by an agent, rather than by Greyhound's downtown Chicago-based employees (as Jordan had suggested). (*See* Sept. 5th Emails.) Neither Rogers nor Watkins prohibited Jordan from temporarily operating the 95th Station while searching for a new agent. (*See id.*) Moreover, Jordan has presented no evidence that he sought clarification of the allegedly contradictory directives prior to making the decision to shut down the 95th Station.

will."[5]  (*See* Motion at 24, Pg. ID 102.)  Jordan's response to Greyhound's Motion does not address the substance of his breach of implied contract claim.  (*See* Response, ECF #14.)  Accordingly, the Court deems Jordan to have waived the claim, and Greyhound is entitled to summary judgment on this basis. *See McCann v. U.S. Bank, N.A.*, 873 F.Supp.2d 823, 847 (E.D. Mich. 2012) (citing *Dillery v. City of Sandusky*, 398 F.3d 562, 569 (6th Cir. 2005)).

Even if the Court were to reach the merits of Jordan's contract claim, Jordan still would not prevail.  At oral argument, Jordan relied solely on *Toussaint v. Blue Cross & Blue Shield of Michigan*, 292 N.W.2d 880 (Mich. 1980), as the basis for his implied contract claim.  In *Toussaint*, the Michigan Supreme Court recognized that an employer's policies and procedures may create a legally enforceable employment contract, terminable only for cause, if such policies and procedures instill 'legitimate expectations' of job security in employees.  *See id.* at 885. However, as the Michigan Supreme Court later observed, the employee handbook

---

[5]  Greyhound's employee handbook states that "employment with Greyhound … is 'at will,' terminable by the employee or [Greyhound] at any time, with or without warning, reason or prior notice…. Any contract of employment must be in writing and signed by the President or another executive officer."  (Handbook, ECF #12-6 at 12, Pg. ID 127.)  Greyhound's employment application, which Jordan completed and signed, similarly states that "employment … can be terminated, with or without cause, at any time at the option of either [Greyhound] or employee.  No representative of the company other than the Chief Executive Officer … has any authority to … make any agreement contrary to the foregoing."  (Employment Application, ECF #12-2 at 3, Pg. ID 109.)

at issue in *Toussaint* (in contrast to Greyhound's employee handbook) did not "contain a statement expressly retaining the employer's common-law right to terminate employees at will." *Rood v. General Dynamics Corp.*, 507 N.W.2d 591, 607 (Mich. 1993) Jordan has cited no authority extending *Toussaint* and finding an implied contract where, as here, the employer's handbook expressly states that an employee is terminable at-will. In fact, the Sixth Circuit has routinely rejected implied contract claims similar to Jordan's when the employer has expressly informed the employee that his employment is at will. *See, e.g.*, *Fussell v. Health Care & Retirement Corp. of America, Inc.*, 931 F.2d 893 (6th Cir. 1991) (unpublished opinion) (citing *Duncan v. Rolm Mil-Spec Computers*, 917 F.2d 261, 263-64 (6th Cir. 1990)); *Pratt v. Brown Mach. Co.*, 855 F.2d 1225, 1234-35 (6th Cir. 1988) ("when the employer has expressly stated to the employee that employment is terminable at will … we will deny *Toussaint* claims relying upon … policy statements made subsequent to these expressions").

Accordingly, Greyhound is entitled to summary judgment on Jordan's breach of implied contract claim.

## CONCLUSION

The crux of Jordan's Complaint is that Greyhound treated him unfairly by requiring him to keep the 95th Station open and then terminating him when he refused to comply. However unfair this treatment may have been, Jordan has

25

failed to show that it was (1) discriminatory under the ELCRA or (2) in breach of an implied contract. Accordingly, for all of the reasons stated in this Opinion and Order, **IT IS HEREBY ORDERED** that Greyhound's motion for summary judgment (ECF #12) is **GRANTED.**

s/Matthew F. Leitman
MATTHEW F. LEITMAN
UNITED STATES DISTRICT JUDGE

Dated: August 27, 2014

    I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 27, 2014, by electronic means and/or ordinary mail.

s/Holly A. Monda
Case Manager
(313) 234-5113